UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MICHAEL A. SHEPARD, SR.,

      Plaintiff,

      v.                                          Case No. 21-C-501

EMILY BLOZINSKI, et al.,

      Defendants.

---

## DECISION AND ORDER

---

Plaintiff Michael A. Shepard, Sr., who is representing himself, is proceeding on Fourteenth Amendment claims against Defendants Emily Blozinski and Officer Vanness based on assertions that they denied medical care for his infected finger, which resulted in his finger having to be amputated. Dkt. Nos. 6 & 25. On July 8, 2022, Defendants filed motions for summary judgment. Dkt. Nos. 36 & 43. For the reasons explained in this decision, the Court will grant Vanness' motion and deny Blozinski's motion.

## BACKGROUND

At the relevant time, Plaintiff was a pretrial detainee at the Brown County Jail, where Defendant Officer Vanness worked as a correctional officer and Defendant Emily Blozinski worked as a nurse. Dkt. No. 40, ¶¶1-2; *see also* Dkt. No. 45, ¶2. On June 14, 2020, a little more than a month before Plaintiff arrived at the jail, Plaintiff injured his right middle finger when a sharp piece of broken window glass sliced through it. Dkt. No. 57-1 at 1-7. Plaintiff went to St. Vincent's Hospital where he was diagnosed with a fractured finger. *Id*. at 4. Medical care providers pierced two holes in his fingernail "to relieve pressure and blood." *Id*. They also applied

a finger splint and ordered a ten-day supply of antibiotics (cephalexin) and pain medication (hydrocodone-acetaminophen). *Id*.

About a month later, on July 15, 2020, Oneida County law enforcement took Plaintiff into custody. Dkt. No. 57, ¶5. Before booking him into the Oneida County Jail, they took Plaintiff to St. Mary's Hospital for medical clearance. *Id*.; *see also* Dkt. No. 57-1 at 8-10. According to the emergency room notes,

> [Plaintiff's] right middle finger . . . looks like it was drained. He has 2 holes on the top of the nail bed and he has a healing wound on the tip of the finger . . . he needs to be better wound care on that. It does look infected now but he will need followup for that.

Dkt. No. 57-1 at 9-10. Following the emergency room visit, Plaintiff was taken to the Oneida County Jail, where he asserts that he was allowed to wear a finger splint. *See* Dkt. No. 57, ¶5.

A couple weeks later, on July 27, 2020, Plaintiff was transferred from the Oneida County Jail to the Brown County Jail. Dkt. No. 40, ¶¶24-25. At the time, Officer Vanness was assisting with booking inmates into the jail, including completing a booking observation report. *Id*., ¶¶32-34. Officer Vanness explains that he is not a medical professional, so he could not approve medical devices or make medical decisions during the booking process; he simply filled out the screening documents and forwarded it to jail medical staff for review and evaluation. *Id*., ¶¶38-39, 54.

According to Plaintiff, when he arrived at the jail, Officer Vanness ordered him to remove his splint because it was metal. Dkt. No. 57, ¶5. Plaintiff asserts that Officer Vanness told him that the finger splint would need to be approved by the medical department before he could have it. *Id*. Plaintiff states that removing the splint caused extreme pain, but Officer Vanness continued the booking process anyway, including fingerprinting him. *Id*. When it became clear that the injured finger could not be fingerprinted due to Plaintiff's pain, Officer Vanness asked Plaintiff about it. *Id*. On the booking observation report, Officer Vanness wrote, ". . . right middle finger

2

had a piece of glass go thru it . . . ." Dkt. No. 38-1. Plaintiff asserts that Officer Vanness told him he would contact the Health Services Unit for follow-up. Dkt. No. 65 at 4. Plaintiff states that he never saw Officer Vanness again nor was he ever contacted by health services about his infected finger. *Id*.

According to Officer Vanness, Plaintiff never complained about pain or a fractured finger, and he was not wearing a finger splint. Dkt. No. 40, ¶36. Further, even if Plaintiff had been wearing a splint, Officer Vanness could not have approved it because he is not medical staff. *Id*., ¶¶39-40, 54. Officer Vanness also explains that, if Plaintiff's finger splint was metal (as Plaintiff claims it was), it would have presented a safety and security concern as an inmate could use it as a weapon to hurt himself or others; thus, Plaintiff would not have been allowed to have it unless it was medically approved. *Id*., ¶¶40-41. Officer Vanness further explains that requesting to wear a finger splint does not constitute a medical emergency, so he would have relied on medical staff to determine what, if any, medical care was needed for Plaintiff's finger. *Id*., ¶¶50-51.

Two days after booking, on July 29, 2020, Plaintiff saw Blozinski during medication pass. Dkt. No. 57 at 4. He asserts that he told Blozinski that he was in extreme pain, but she ignored him and refused to physically examine him even though his finger looked infected. *Id*. Blozinski explains that the proper way for an inmate to request non-emergency medical care is to either submit a health service request or go to health services during sick call. Dkt. No. 45, ¶¶26-28. An inmate cannot simply demand a physical examination during rounds. *See id*. Plaintiff asserts that he encountered Blozinski again the following day, on July 30, 2020, and this time she took his vitals, but she again failed to physically examine his finger. Dkt. No. 57 at 4-5.

About a month later, on September 6, 2020, Plaintiff submitted his first health services request stating, "What is 'cephalexin' and 'glipivide' for? Those are medications that are

3

prescribed to me." Dkt. No. 65-1 at 1. Blozinski responded, "You are prescribed lisinopril 20mg (high blood pressure), atorvastatin 40mg (high cholesterol) and metformin 1000mg (diabetes)." *Id*. Three days later, on September 9, 2020, Plaintiff submitted his second health services request stating, "I need my finger and toe looked at both nails are black and my finger is starting to stink and it's not from going through the toilet paper." Dkt. No. 45, ¶¶38-39. Blozinski scheduled him for a health services appointment the following day. *Id*., ¶¶40-41. Plaintiff reported that his finger gets "swollen and drains at times" and that at the moment the "swelling is down compared to normal." *Id*., ¶42. The nurse ordered an x-ray, antibiotics for seven days, and blood pressure/lab checks. *Id*., ¶¶43-47. Over the next couple weeks, Plaintiff got x-rays, completed a urinary analysis and blood culture, was prescribed pain medication, and was scheduled to see an offsite specialist. *Id.*, ¶¶48-54.

On September 20, 2020, Plaintiff filed a grievance about his confiscated finger splint and his extreme pain. Dkt. No. 39-1. The jail responded to the grievance by stating, "You were seen by the medical provider and have been referred to orthopedics." *Id*. Plaintiff appealed claiming that the jail did not address his complaints of pain, and the appeal was deemed unfounded on the merits because he had an upcoming doctor's appointment. *Id*. The following day, on September 21, 2020, an unidentified correctional officer allegedly saw that Plaintiff was in pain and noted that his finger "smelled infected." Dkt. No. 65 at 7. He allegedly called Blozinski, who responded that Plaintiff should submit a health services request and that it was not an emergency. *Id*.

Two days later, on September 23, 2020, Dr. Kirkpatrick examined Plaintiff at his outside clinic. Dkt. No. 45, ¶55. Dr. Kirkpatrick suspected that Plaintiff had a chronic infection with osteomyelitis (bone inflammation/infection). *Id*., ¶60. He ordered an MRI and occupational therapy. *Id*., ¶61. The last page of Dr. Kirkpatrick's report notes, "This is to certify that Michael

4

A. Shepard has been under my care from 9/23/2020 and was provided a splint that must be worn at all times. Please rewrap the area after patient showers." Dkt. No. 46-1 at 155. Upon returning to the jail, Plaintiff submitted a health services request asking for a soap-water soak for his finger. Dkt. No. 57-1 at 60. Blozinski responded a couple days later, "MD appointment notes arrived, no order for soaks noted at this time." *Id*.

Two days later, on September 25, 2020, Plaintiff filed a grievance stating that health services will not do anything about his infected finger, including giving him finger soaks and antibiotics. *Id.* at 62. The jail responded, "you were referred to and seen by orthopedics on 9-23-2020. On 9-28-2020, we were advised by the clinic that no finger soaks or antibiotics were ordered." *Id*. Plaintiff appealed and the appeal was deemed unfounded on the merits. *Id*. On September 27, 2020, Plaintiff filed a health services request stating that he was denied soaks and antibiotics prescribed by Dr. John Christopher Williams. *Id.* at 41. Blozinski responded, "HSU did not receive an order for your finger for soaks or antibiotic order, you were seen by facility provider and received care with testing and sent to outside provider." *Id*.

On October 7, 2020, Plaintiff had an MRI, which showed a deformity in Plaintiff's right middle finger, consistent with osteomyelitis (a bone infection). Dkt. No. 45, ¶¶70-72. Two days later, on October 9, 2020, Dr. Kirkpatrick recommended that Plaintiff's finger be amputated. *Id*., ¶¶73-75. Plaintiff's surgery was scheduled for less than three weeks later on October 29, 2020, which was the first available appointment. *Id*., ¶77.

A couple weeks before the scheduled surgery, on October 14, 2020, a nurse examined Plaintiff following a fight with another inmate. *Id*., ¶78. Plaintiff reported that his injured finger was smashed and kicked during the fight. *Id*., ¶79. The nurse ordered ice and 800mg of ibuprofen. *Id*., ¶80. The next day, Plaintiff submitted a health services request asking for a brace for his finger

5

and his back due to injuries from the fight. *Id.*, ¶81. In response, Blozinski ordered 650mg of Tylenol for pain management and gave Plaintiff information on stretches for his back. *Id.*, ¶¶82-84. At some point, Plaintiff's splint, which had been provided by Dr. Kirkpatrick on September 23, 2020, was confiscated.

A little more than a week before his surgery, on October 17, 2020, Plaintiff submitted a health services request complaining that his surgery was scheduled too far out and that he was experiencing pain. *Id.*, ¶85. Blozinski responded that health services scheduled the next available date for surgery. *Id.*, ¶86. She also scheduled Plaintiff with the next available appointment with health services to assess his pain. *Id.*, ¶87. Plaintiff then filed a grievance about the same issue, and the jail responded, "if you have medical issues of concern, you are advised to address them on the Turnkey system in order to be scheduled for nurse sick call. Be advised that outside medical appointments are scheduled by HSU." Dkt. No. 57-1 at 85.

A few days later, on October 20, 2020, Plaintiff met with a nurse about pain from his injury. Dkt. No. 45, ¶88. Plaintiff complained that his Tylenol did not work long enough. *Id.*, ¶89. The nurse advised that ibuprofen may last longer and told Plaintiff that she would reach out to the jail provider to see if ibuprofen can be started. *Id.*, ¶90. Plaintiff agreed to try ibuprofen. *Id.*, ¶91. The next day, on October 21, 2020, the jail medical provider prescribed 200 mg of ibuprofen, three tablets twice a day. *Id.*, ¶92.

About a week later, on October 29, 2020, Plaintiff went to Aurora Baycare Medical Center for his amputation surgery and returned to the jail on the same day. *Id.*, ¶¶94-95. Dr. Kirkpatrick provided Plaintiff discharge instructions, including a list of prescription medications to take. *Id.*, ¶96. To treat pain, Dr. Kirkpatrick suggested one to two tablets of Tylenol 300mg every four hours, as needed. *Id.*, ¶97. At the jail, Blozinski altered that treatment to Tylenol 650mg two times

6

Case 1:21-cv-00501-WCG   Filed 03/23/23   Page 6 of 16   Document 73

a day for three days only. Dkt. No. 57-1 at 85. On November 4, 2020, Plaintiff submitted a grievance about his finger bleeding through the bandage and his dressing not being changed when it was wet consistent with Dr. Kirkpatrick's orders. Dkt. No. 57-1 at 106. The jail responded, "per your post operative plan for orthopedics, your dressing was to remain in place until your initial follow up visit." *Id*.

Plaintiff went to see Dr. Kirkpatrick for a follow up appointment two days later. *Id*. Dr. Kirkpatrick ordered,

> Patient must keep dressing clean and dry. If dressing gets wet need to call for dressing change immediately. Please give 500mg of Tylenol and then two hours later give patient 400mg Ibuprofen to help maintain pain control. Please ice finger in 20 minute increments six times daily. Patient will arrive to facility with ice pack, please allow patient to utilize this for an hour.

*Id.* at 112. Later that day, on November 6, 2020, Plaintiff filed another grievance asserting that he was not given pain medication, the ice pack, or dressing changes consistent with Dr. Kirkpatrick's orders. *Id.* at 108. Blozinski responded, "You will receive Tylenol at AM and PM med pass, Ibuprofen at Noon med pass. You will be offered ice three times per day at each med pass. Bandage changes are done as staff is able." *Id*. Plaintiff appealed and the jail responded, "Recommendation from outside provider have been reviewed. Your medications are being administered as ordered by the facility provider." *Id*. at 110.

On November 8, 2020, Plaintiff filed a health services request complaining that his dressings were not being changed when they got wet, he was in extreme pain, and his finger was red with puss coming out of it. *Id*. at 113. Blozinski responded, "If you are having a medical emergency notify the officer. As needed pain medication is ordered and given during med-pass, outside provider note from appointment will be reviewed with facility provider. You were started on Bactrim (antibiotic) when you returned from surgery." *Id*.

7

The next day, on November 9, 2020, Plaintiff filed a health services request asking whether he could have pain medication around midnight or 1am. *Id*. at 114. Blozinski replied, "you are scheduled for pain medication during medication pass." *Id*. The following day, on November 10, 2020, Plaintiff filed a health services request stating, "after my surgery I'm having a rough time sleeping like I'm on an emotional roller coaster after amputation." *Id*. at 115. Blozinski responded, "metal health can meet with you." *Id*.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The party asserting that a fact is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

8

## ANALYSIS

Defendants assert that they are entitled to summary judgment based on Plaintiff's failure to exhaust the administrative remedies and based on the merits. Officer Vanness argues that he interacted with Plaintiff only one time—during the booking process on July 27, 2020—and Plaintiff did not file a grievance regarding that interaction until September 20, 2020. Dkt. No. 41. Officer Vanness further claims that he responded to Plaintiff's complaints regarding his finger injury in a reasonable manner, and within his capacity as a correctional officer. *Id*. Blozinski argues that Plaintiff failed to exhaust the available administrative remedies because he did not file a grievance following each of his interactions with her. Dkt. No. 44. She further claims that once Plaintiff actually filed a health services request on September 9, 2020, she responded reasonably by booking follow-up appointments, ordering tests and medication, and referring him to an outside provider. *Id*.

### A. Exhaustion of Administrative Remedies

"[N]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until administrative remedies as are available are exhausted." 42 U.S.C. §1997e(a). "To satisfy the exhaustion requirement, an inmate must take each of the steps prescribed by the state's administrative rules governing prison grievances." *See Chambers v. Sood*, 956 F.3d 979, 983 (7th Cir. 2020) (citing *Lockett v. Bonson*, 937 F.3d 1016, 1025 (7th Cir. 2019)). "The primary justification for requiring prisoners to exhaust administrative remedies is to give the prison an opportunity to address the problem *before* burdensome litigation is filed." *Id.* (citing *Woodford v. Ngo*, 548 U.S. 81, 93-95 (2006); *Schillinger v. Kiley*, 954 F.3d 990, 995-96 (7th Cir. 2020)).

9

The Brown County Jail has a procedure to file grievances and appeals through the Kiosk system. Dkt. No. 39, ¶¶3-7. Under the grievance procedure, an inmate must submit a written grievance within forty-eight hours of the occurrence. *Id.*, ¶9. The grievance will be reviewed and responded to within seven days. *Id.* The inmate has the right to appeal the response and submit the appeal within forty-eight hours of receipt of the response. *Id.*

Officer Vanness argues that Plaintiff did not file a grievance about their July 27, 2020 interaction until September 20, 2020, more than forty-eight hours after the event giving rise to the grievance. Ordinarily, a grievance that is untimely filed does not fulfill the exhaustion requirement. *Conyers v. Abitz*, 416 F.3d 580, 584 (7th Cir. 2005). This is true because "the benefits of exhaustion" can be realized only if the prison grievance system is given a fair opportunity to consider the grievance on the merits. *Woodford v. Ngo*, 548 U.S. 81, 95 (2006). But failure to comply with administrative deadlines does not doom the claim where the institution treats the filing as timely and resolves it on the merits. *Conyers*, 416 F.3d at 584 (citing *Riccardo v. Rausch*, 375 F.3d 521, 524 (7th Cir. 2004)). "In that instance the grievance has served its function of inviting prison administrators to take corrective action, and thus the administrative exhaustion requirement has been satisfied." *Id.*

On September 20, 2020, Plaintiff filed a grievance alleging that his finger splint was confiscated during the booking process and that he was experiencing "unbelievable pain." Dkt. No. 57-1 at 46. Although the grievance was filed more than forty-eight hours after Plaintiff's interaction with Officer Vanness, the jail responded to the grievance on the merits by writing, "You were seen by the medical provider and have been referred to orthopedics." Dkt. No. 39-1 at 3. Plaintiff appealed the jail's response two days later. *Id.* at 2. Given that the jail considered the merits of Plaintiff's untimely grievance, the grievance served its function and the exhaustion

requirement was satisfied. Officer Vanness is therefore not entitled to summary judgment on this basis.

Blozinski also argues that Plaintiff failed to exhaust the administrative remedies before he filed his lawsuit. She highlights that Plaintiff's grievances were untimely and that he did not file separate grievances following each alleged violation of his rights. On September 25, 2020, Plaintiff filed a grievance stating that health services was not doing anything about his infected finger. Dkt. No. 57-1 at 62. Health services responded five days later, "You were referred to and seen by orthopedics on 9-23-2020. On 9-28-2020, we were advised by the clinic that no finger soaks or antibiotics were ordered." *Id*. Plaintiff filed a second grievance on September 27, 2020, about the inadequacy of the care he was receiving for his finger. Health Services responded to the grievance two months later, on November 28, 2020, with a summary of the care that Plaintiff had received. *Id.* at 64-65. Finally, following the amputation of his finger, Plaintiff filed grievances complaining that the after-care instructions were not being followed and that he was in a lot of pain. The jail responded to Plaintiff's grievances, and he appealed at least one of those responses. *Id.* at 108-10.

First, even if Plaintiff's grievances were submitted outside the forty-eight-hour window, the grievances were resolved on the merits, so the jail had an opportunity to correct the issues raised by Plaintiff, thereby satisfying the exhaustion requirement. Further, under the "continuing violation" doctrine, an inmate need not file multiple grievances raising the same ongoing issue. *See Turley v. Rednour*, 729 F.3d 645, 650 (7th Cir. 2013). "A violation is continuing where 'it would be unreasonable to require or even permit [a prisoner] to sue separately over every incident of the defendant's unlawful conduct.'" *Id*. at 651 (quoting *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001)). Plaintiff did not need to file a separate grievance against Blozinski following

11

each interaction with her. He pursued grievances about the inadequate treatment he was receiving for his finger, both before and after its amputation, thereby satisfying the exhaustion requirement. *See* Dkt. No. 57-1 at 62. Blozinski is not entitled to summary judgment on exhaustion grounds.

**B. Fourteenth Amendment Medical Care**

To survive summary judgment on a Fourteenth Amendment claim, Plaintiff must provide evidence from which a reasonable jury could conclude that: (1) he had an objectively serious medical condition; and (2) Defendants' response to the medical condition was objectively unreasonable. *Williams v. Ortiz*, 937 F.3d 936, 942-43 (7th Cir. 2019). With respect to the second prong, Plaintiff must prove that Defendant acted "purposefully, knowingly, or perhaps even recklessly" when considering the consequences of his conduct. *Id*. (quoting *Miranda v. Cty. of Lake*, 900 F.3d 335, 353 (7th Cir. 2018)). "This standard requires courts to focus on the totality of facts and circumstances faced by the individual alleged to have provided inadequate medical care and to gauge objectively—without regard to any subjective belief held by the individual—whether the response was reasonable." *Id.* (quoting *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018)). Negligence or gross negligence does not meet this standard. *McCann*, 909 F.3d at 886. The parties agree that Plaintiff's infected finger was an objectively serious medical condition, so the Court's analysis will focus on whether Plaintiff has presented evidence that Officer Vanness and/or Blozinski's responses to Plaintiff's condition were objectively unreasonable.

With respect to Officer Vanness, Plaintiff states that Officer Vanness knew about his extremely painful and infected finger because Plaintiff told him about how he had injured his finger. Plaintiff asserts that Officer Vanness should have immediately contacted health services to inquire about whether Plaintiff could continue to wear his splint. But, as Officer Vanness explains, the continued splinting of a finger that had been injured more than a month earlier is not

12

an emergency requiring immediate care. Although Plaintiff asserts that the removal of the splint was painful, Officer Vanness accommodated Plaintiff's pain by not fingerprinting his middle finger. Further, given that the Oneida County Jail's transfer summary indicated that Plaintiff was "Violent, Aggressive, Angry," Dkt. No. 57-1 at 13, no jury could reasonably conclude that it was objectively unreasonable for Officer Vanness to temporarily confiscate a metal splint and leave it to medical staff to assess whether, given the potential security risks, the splint was medically necessary.

Finally, while it is true that Officer Vanness noted on the booking form that there was no "[v]isible injury or illness," he also noted that the "jail should know about . . . [Plaintiff's] right middle finger [that] had a piece of glass go thru it." Dkt. No. 38-1 at 1-2. In fact, Plaintiff premises his claim against Blozinski, in part, on the fact that she refused to examine his finger "even while being aware of Officer Vanness, Booking report, which indicated that plaintiff suffered a piece of glass going through his right hand middle finger . . . ." Dkt. No. 65 at 5. In short, no reasonable jury could conclude that Officer Vanness' decision to remove Plaintiff's splint for security reasons and highlight Plaintiff's injury on the booking report, which was then forwarded to health services for further review, was objectively unreasonable. Officer Vanness is therefore entitled to summary judgment.

With respect to Blozinski, a factual dispute exists as to whether her responses to Plaintiff's complaints about his finger prior to it being amputated were objectively unreasonable. Plaintiff points out that, shortly after he arrived at the jail, Blozinski twice ignored his complaints about his finger being infected and painful. Blozinski contends that a painful finger is not an emergency requiring immediate attention and inmates are not entitled to demand that medical staff interrupt their duties to respond to an inmate's complaints about non-emergent conditions. But it appears

13

that Plaintiff had more than a "painful finger." He appears to have had an infection in a deep wound to his finger that eventually led to the finger's amputation. Whether this was the kind of condition that Nurse Blozinski should have immediately recognized as calling for emergency or at least urgent attention is not clear from the record. True, Plaintiff was informed that if he wanted to be evaluated by health services, he needed to submit a health services request, and he apparently did not do so for until more than a month later. But correctional staff may not ignore obvious risks to inmates because the proper form was not filed. Even after Plaintiff complied with the requirement to file a health services request, the care he received was ineffective in light of the fact that after it was commenced a guard allegedly reported to Blozinski that Plaintiff's finger "smelled infected" and his condition continued to progress.

Plaintiff asserts that after seeing the specialist the first time, Blozinski refused to give him antibiotics and soap-water soaks as the emergency room doctor had ordered when he first injured his finger. Blozinski contends that her response was reasonable since Plaintiff had recently been examined by a specialist and the specialist did not recommend antibiotics or soaks. Instead, he ordered occupational therapy and an MRI, orders that were complied with. But again, considering the ultimate result was amputation of the finger, a jury may conclude that the failure to do more to at least keep the wound clean and continue antibiotics was patently unreasonable. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("As an ethical matter, a nurse confronted with an inappropriate or questionable practice should not simply defer to that practice, but rather has a professional obligation to the patient to take appropriate action, whether by discussing the nurse's concerns with the treating physician or by contacting a responsible administrator or higher authority." (internal quotation marks omitted)). Likewise, the delay in scheduling the amputation after the need to do so was apparent creates a jury question. Blozinski contends the surgery was

14

scheduled at the first available appointment, but it is unclear how or who determined what was available.

A jury could also reasonably conclude that Blozinski's response to Plaintiff's complaints of pain and inadequate treatment following the amputation of his finger was objectively unreasonable. The specialist initially ordered that Plaintiff receive up to 600mg of Tylenol every four hours, as needed, to help control his pain. Rather than complying with this order, Blozinski decreased both the total daily dosage (from 3600mg to 1300mg) and frequency (from six times per day to two times per day) of Plaintiff's pain medication and ordered that he receive that decreased amount for only three days. When Plaintiff complained that the stump of his finger was bleeding through the bandages and that his bandages were wet, his concerns were sidestepped by telling him he was supposed to keep the bandage on until his follow-up appointment. Similarly, after Plaintiff's follow-up appointment, the specialist gave even more specific instructions about pain management and bandage care, yet, once again, Blozinski unilaterally made changes to those orders and persisted with those changes even after Plaintiff complained about the severity of his pain. Given the nature of the surgery, Plaintiff's complaints of severe pain, and the danger of infection, a jury could conclude that Blozinski's decisions to limit his pain medication and ignore his complaints about the condition of his bandages was objectively unreasonable. Accordingly, Blozinski is not entitled to summary judgment on his claims against her.

## NEXT STEPS

Plaintiff's claim against Blozinski will proceed to trial. Given the complexity of trying a case before a jury, including offering a coherent opening statement and closing argument, presenting and examining witnesses, and locating and introducing evidence, the Court concludes that counsel would be of great assistance to Plaintiff, the Court and even the defense in ensuring the next stage of litigation proceeds efficiently. Accordingly, the Court will make efforts to recruit

a volunteer lawyer to represent him. The demand for volunteer lawyers is high, but the supply is low. Few lawyers have the time, ability, or experience to volunteer for cases such as these. The Court encourages Plaintiff to be patient as it makes efforts to recruit a lawyer to represent him. The process may take some time. The Court will promptly notify Plaintiff in the event a lawyer volunteers to represent him. In the meantime, the Court encourages the parties to explore whether settlement is possible.

## CONCLUSION

For these reasons, Defendant Officer Vanness' motion for summary judgment (Dkt. No. 36) is **GRANTED** and Defendant Emily Blozinski's motion for summary judgment (Dkt. No. 43) is **DENIED**.

**SO ORDERED** at Green Bay, Wisconsin this 23rd day of March, 2023.

s/ William C. Griesbach
William C. Griesbach
United States District Judge